# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

_____

| | |
|---|---|
| In Re:<br><br>MARY ANNE BACHMAN,<br><br>**Debtor.** | **Case No. 05-05596-JDP**<br>**Chapter 7** |

_____

| | |
|---|---|
| RICHARD E. CRAWFORTH,<br>as Trustee,<br><br>**Plaintiff,**<br><br>**vs.**<br><br>MARY ANNE BACHMAN,<br>VIOLA BLACK, BONNIE J.<br>CAMP and John or Jane<br>Does 1-10,<br><br>**Defendants.** | **Adv.  Proceeding**<br>**No. 06-6027** |

_____

## MEMORANDUM OF DECISION

_____

MEMORANDUM OF DECISION - 1

Appearances:

> Jed Manwaring, EVANS KEANE, Boise, Idaho, Attorney for
> Plaintiff.

> David Kras, Boise, Idaho, Attorney for Defendant Mary Anne
> Bachman.

> Sam Johnson, JOHNSON & MONTELEONE, Boise, Idaho,
> Attorney for Defendant Viola Black.

> Bonnie Camp, Boise, Idaho, Pro Se Defendant.

## Introduction

In this hotly contested adversary proceeding, the Court must resolve several legal and factual issues arising out of the chapter 7[1] trustee's claims against the debtor, her mother, and her friend.

Debtor Mary Anne Bachman filed a chapter 7 petition on October 14, 2005.  On April 25, 2006, the chapter 7 trustee appointed in Debtor's case, Richard Crawforth ("Trustee"), commenced this adversary proceeding by filing a complaint against Debtor, her mother Viola Black ("Black"), and John or Jane

---

[1]  Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, in effect prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

MEMORANDUM OF DECISION - 2

Does 1-10.  The complaint was amended twice, and Bonnie J. Camp ("Camp"),

Debtor's friend and former employee, was added as an additional defendant.

The Court conducted a trial in this action which was held on August

9 and 10, 2007, and then continued on September 6 and 7, 2007.  At the

conclusion of the trial, the Court took the issues under advisement.  The Court

invited the parties to submit proposed findings of fact and conclusions of law,

which the parties have done.  Docket Nos. 67, 68, 69.  Having now carefully

considered the record, the arguments of the parties, the testimony presented, and

the applicable law, the Court intends this Memorandum to serve as its findings of

fact and conclusions of law and disposition of the issues.  Fed. R. Bankr. P. 7052.

## Background Facts

Trustee's Second Amended Complaint alleges five separate counts

against the defendants.[2]  At the core of each of these claims is Trustee's contention

---

[2]  Several of the counts in Trustee's complaint cite multiple, distinct provisions of
the Code, each of which could serve as the basis of a separate claim against the
defendants.  While many of these claims are inartfully plead, none of the defendants
objected to this approach, and they have, in the Court's opinion, impliedly consented to
the trial of these issues as framed by the complaint.  See Rule 7015, which incorporates
Federal Rule of Civil Procedure 15(b) ("When issues not raised by the pleadings are tried
by express or implied consent of the parties, they shall be treated in all respects as if they
had been raised in the pleadings").  In the discussion that follows, the Court has
attempted to address each applicable Code provision cited by Trustee, and the claims
arising under those Code provisions, implicated under the facts adduced at trial and as
argued by the parties.

MEMORANDUM OF DECISION - 3

that Debtor, and in some instances others, engaged in fraudulent and deceptive

conduct in dealings with Debtor's assets and financial affairs, both before and

after the filing of Debtor's bankruptcy petition. While each of these counts

present discrete claims and legal issues, the facts necessary for disposition of the

claims blend together. Thus, at the outset of this decision, it is helpful to present a

brief chronological sketch of the facts to provide a general context for the

narrative discussion that follows. Additional facts pertinent to specific claims

will be set forth later in the decision as each legal issue is analyzed separately.[3]

      Although there are three named defendants in this adversary

proceeding, Debtor and her conduct were clearly the focus. Prior to filing for

bankruptcy relief, Debtor was involved in a number of different business and

financial ventures. She was a 4-H leader, a coach, a bus driver, a substitute

---

[3] The findings of the Court that follow include both disputed and undisputed facts. In resolving disputed issues of fact, the Court has carefully considered the testimony of the various witnesses, and based upon its opportunity to observe them testify, the Court has assessed their credibility. Since the testimony of witnesses was in some instances inconsistent with other evidence presented, the Court's findings reflect its judgment concerning the relative weight assigned to that testimony. In general, the Court finds Debtor to be almost wholly lacking in credibility. Most of her answers were evasive, vague, and unresponsive to the questions, especially those from Trustee's counsel. Indeed, it appears to the Court that, at trial, Debtor engaged in a concerted effort to respond to questions in the narrowest, most hyper-technical fashion. In the context of an action which, in many instances, tests Debtor's candor as a debtor in a bankruptcy case, this is disappointing and counterproductive for all concerned. As a result, the Court has assigned little weight to Debtor's version of the facts.

MEMORANDUM OF DECISION - 4

teacher, an EMT, a horse-trainer, and most recently, an owner and manager of a significant business operation. This litigation centered principally on her involvement with horses and her businesses.

For the past 20 years, Debtor has been engaged in business. In 1988, Debtor began a firefighting transportation business.[4] That company would later become known as Bachman Transport, Inc. ("Bachman Transport"). Initially, Bachman Transport was a small operation, consisting of two busses and a few employees. However, in the next few years, Debtor was able to expand her business into a thriving operation, with 21 busses and approximately 80 employees. As Bachman Transport grew, so too did Debtor's responsibilities and financial obligations. In addition to overseeing the day-to-day operations, Debtor handled all the paperwork, and performed other managerial duties.

In addition to owning and operating Bachman Transport, Debtor has been involved in some fashion with "American Paint" horses, for pleasure and profit, for most of her life. Operating under the assumed business name "Paint-N-Place Ranch," she raised, boarded, bred, and trained paint horses for show.

---

[4] Debtor testified that prior to starting Bachman Transport, Inc., she and her former husband owned a veterinary supply and livestock feed store. However, she "lost [that business] in a divorce." Trial Transcript, Vol. III of IV, p. 79, line 11.

MEMORANDUM OF DECISION - 5

Debtor also sold young horses, and offered others the stud services of her primary

stallions.

In early 2002, Debtor was residing on a ranch in Nampa, Idaho.  She

also operated her horse business on that property, and had several head of horses

pastured there.  She was struggling financially, fell delinquent on her land

payments, and eventually lost the Nampa property to foreclosure in March 2002.

Trial Transcript, Vol. IV of IV, p. 55, lines 17-23.  Immediately, she began

looking for a new property on which to reside and pasture her horses.  Debtor

located a sizeable ranch in Wilder, Idaho, ("Ranch Property"), which she felt

would suit her needs, and together with her mother, decided to purchase it.  That

sale closed in June, 2002.[5]

Debtor continued her business operations.  However, as a result of

meager fire seasons in 2003 and 2004, and other family-related problems,

Bachman Transport struggled financially.  It was Debtor's practice to finance

Bachman Transport's operations using the previous year's surplus income.  If her

capital ran out, she would seek short-term personal loans from various individuals.

Debtor had always been hesitant about incurring bank loans, but she was not

bashful about approaching friends and associates for help.  She was apparently

---

[5]  This transaction is discussed in depth in part III of this memorandum.

MEMORANDUM OF DECISION - 6

persuasive, too, since over the years she borrowed many thousands of dollars from

Black, Gerald Krupp ("Krupp"), Dan Hall ("Hall"), and others.

After the 2004 summer fire season, Debtor realized that she needed

to scale down her business operations. She began to sell off Bachman Transport's

assets. Rocky Mountain Fire Services, LLC ("Rocky Mountain") purchased one

of the busses. Later, in October 2004, Charles Wilson ("Wilson"), Rocky

Mountain's chief executive officer, approached Debtor with an offer to buy

Bachman Transport. Over the next several months, Debtor and Wilson negotiated

the various terms of the buyout.

As one of the conditions to the sale, Wilson requested that Debtor

complete the unfiled tax returns for Bachman Transport for the previous three

years. Debtor recruited Camp to assist her in that task. Debtor had known Camp

since high school, where the two competed against each other in rodeo

competitions. Later, when Camp began showing paint horses, she and Debtor

were reacquainted, and they became close friends. Debtor and Camp frequently

traveled and showed their horses together. Debtor began boarding several of

Camp's horses, and Camp assisted from time to time in caring for Debtor's horses.

Debtor hired Camp to work in the office at Bachman Transport. In

February 2005, Camp completed her assignment of organizing Bachman

MEMORANDUM OF DECISION - 7

Transport's records for delivery to a tax accountant to complete the filing of the missing returns.  With all of the other terms of the sale arranged, Debtor and Wilson closed their deal.  As consideration for the sale, Debtor received $15,000 cash and a 20% ownership interest in Rocky Mountain.

Several months later, on October 14, 2005, Debtor filed for bankruptcy relief.

## Discussion and Disposition of the Issues

**I.     Trustee's Objections to Debtor's Discharge**

### A.     Additional Facts

A large part of this litigation centered on Debtor's possession, control and ownership of several "American Paint" horses.[6]  Despite her significant involvement with horses over the years, no horses were listed on Debtor's schedules when she filed for bankruptcy.  However, as a result of her

---

[6] Over the course of the proceedings, counsel for the parties referred to literally dozens of horses.  Keeping the names of these horses straight proved to be a difficult task.  Apart from the volume of horses involved, it appears that it is the custom among those who own such horses to assign each two different names - an American Paint Horse Association registered name and a "barn" name.  These names did not necessarily bear any resemblance to one another.  For example, one particular horse was given the barn name "Bubba," but was registered as "I'm Just Awesome."  Trial Transcript, Vol. IV of IV, p. 26, lines 20-25.  In referencing horses, counsel and the witnesses, all of whom are more familiar with the facts than the Court, toggled between the barn name and the registered name.  Adding to this complexity and confusion was the similarity among several of the registered names.  Apparently, for example, "Mr. Gallant Smoke" is a different horse than "Gallant Smoke."  See Trial Transcript, Vol. IV of IV, p. 26, lines 2-3.

MEMORANDUM OF DECISION - 8

testimony at the § 341(a) meeting of creditors, Trustee and some of her creditors

became concerned that Debtor still owned horses, and that those horses may be

pastured at Ranch Property.  At that meeting, Debtor testified that she used to own

horses, but that she had sold them and no longer owned any horses.  Ex. 4, p. 17.

However, Trustee discovered a number of paint horses present at Ranch Property

when he made a visual inspection.  When he asked her about them at that time,

Debtor told Trustee that all of those horses belonged to others.

Another asset that concerned Trustee was a four-wheeler ATV.

According to the evidence, including the documents admitted at trial and the

testimony of the ATV dealer's representative, on September 15, 2005, Debtor

purchased a red 2005 Yamaha Kodiak ATV from Snake River Yamaha in

Meridian, Idaho for a total purchase price of $6,356.83.  Trial Transcript Vol. I of

IV, p. 22 line 10 through p. 23 line 13.  Debtor gave the dealer a check for the total

purchase price drawn on a checking account at Wells Fargo Bank in the name of

"Black Ranch, Inc., dba Bar TF Ranch."  In connection with this transaction,

Debtor gave Snake River Yamaha a copy of her driver's licence, and personally

signed the Bill of Sale, the Safety Verification Form, the Report of Sale and

Application for Certificate of Title, the Power of Attorney in favor of Snake River

Yamaha, and the payment check.  Ex. 7.  Debtor also took possession of the ATV.

MEMORANDUM OF DECISION - 9

On March 24, 2006, Debtor submitted to a Rule 2004 Examination at Trustee's request.  At that examination, Debtor was questioned regarding her ownership interest in the ATV and her knowledge of its purchase.  In response to those questions, Debtor indicated that she knew nothing about the ATV, that she had nothing to do with the transfer, that she did not authorize anyone to purchase it on her behalf, and that her signature would not appear on the title documents.  The precise exchange at the examination was read into the evidence at trial:

> Q.   Next one, a 2005 Yamaha ATV.
> A.   Holy cow, I don't know anything about that one.
> That would be nice.  But I don't know that one at all.
>
>              * * *
>
> Q.   On the last page we have a 2005 Yamaha ATV.
> A.   I don't have anything like that.
> Q.   Did you ever have?
> A.   I had a little blue – let me think what brand it was.
> But I had it when I was on Airport Road.
> Q.   This is a --
> A.   And I haven't had a four-wheeler since then.
> Q.   This is a new ATV recorded October 11, 2005.
> Just a few days prior to the bankruptcy being filed?
> A.   Nope.  Not me.
> Q.   So it is your testimony you have nothing to do
> with this transfer?
> A.   That's right.
> Q.   Do you know who did?
> A.   No.  I would like to have it.
> Q.   Did you authorize anybody to purchase it on your
> behalf?
> A.   No.

MEMORANDUM OF DECISION - 10

> Q.   Do you see FT Bar Ranch?
> A.   Yes.
> Q.   That is the d/b/a your mother referred to?
> A.   No, it isn't.
> Q.   What is it?
> A.   It's not even right.  It is Bar TF Ranch.  They don't even have this right.  Somebody screwed something up.  Somebody has done this.  But it is not me.
> Q.   So if we go and find the original title there you're saying you wouldn't see your signature on it?
> A.   The Bar TF Ranch is not my d/b/a.
> Q.   What I'm asking is, when we go get the application for title, your signature won't appear on it?
> A.   No.

Trial transcript, Vol. III of IV, page 144, line 25 through page 146, line 2.

Trustee did further investigation regarding the ATV.  Several months later, on June 6, 2006, following a motion hearing they attended, Trustee met with Debtor in a meeting room in the courthouse.  At that meeting, Trustee again asked Debtor whether she owned or knew anything about the ATV.  Again, Trustee testified, Debtor denied any and all knowledge about the ATV.  Trial Transcript, Vol. I of IV, p. 132, line 23 through p. 133, line 7.

Debtor did not disclose the ATV in her bankruptcy schedules, and despite Trustee's efforts to locate the vehicle, its whereabouts were unknown until just two days before the trial commenced.  Acting upon a tip, Trustee and his counsel traveled to a ranch in remote Eastern Oregon, owned by Stoddart Ranches,

MEMORANDUM OF DECISION - 11

Inc.  There, Trustee found the Yamaha ATV, several other suspect vehicles, and a number of horses.

The next asset of interest to Trustee was the proceeds from a personal injury settlement.  In September 2005, Debtor had received a $47,000 check from Sulzer Orthopedics, Inc. ("Sulzer") as part of a settlement for Debtor's personal injury claim.  Debtor used the money to pay certain creditors.  In September, she paid $25,000 "rent" to Ocwen Financial, which serviced a mortgage on Ranch Property.  In October, she sent Ocwen an additional $7,000.  Debtor gave some of the money to Rocky Mountain, which it was supposed to use to purchase health insurance coverage for Debtor.  Lastly, Debtor paid several of the employees of Bachman Transport.  By the time Debtor filed her bankruptcy petition on October 14, 2005, the entire $47,000 had been spent.  Debtor did not list these transfers to creditors in her Statement of Financial Affairs ("SOFA"), although Question No. 3 specifically solicits information about "payments on loans, . . . and other debts, aggregating more than $600 to any creditor, made within **90 days** immediately preceding the commencement of this case." (Emphasis in original).  In addition, while Trustee would eventually recover another $49,600 from Sulzer on Debtor's claim, she did not disclose her possible entitlement to further amounts in her schedules.

MEMORANDUM OF DECISION - 12

### B.   Analysis

Trustee contends Debtor is not entitled to a discharge pursuant to §§ 727(a)(2), (a)(3), and (a)(4)(A).[7]  The Code provides that the court shall grant the debtor a discharge unless:

> (2)  the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
> > (A)  property of the debtor, within one year before the date of the filing of the petition; or
> > (B)  property of the estate, after the date of the filing of the petition;
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case-
> > (A)  made a false oath or claim;

11 U.S.C. § 727(a).

---

[7]  Trustee cited these and other Code provisions as a basis for denial of Debtor's discharge in his Second Amended Complaint in a vague and summary fashion.  The complaint does not link the various provisions to specific acts of Debtor.  At trial, Trustee's evidence focused on §§ 727(a)(2), (a)(3), and (a)(4)(A).  As a result, while they are also cited in the complaint, the Court will not address Trustee's claims under §§ 727(a)(4)(D) and (a)(5).

MEMORANDUM OF DECISION - 13

"[C]ourts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." *Bernard v. Sheaffer* (*In re Bernard*), 96 F.3d 1279, 1281 (9th Cir. 1996); *Weiner v. Perry, Settles & Lawson, Inc.* (*In re Weiner*), 208 B.R. 69, 71 (9th Cir. BAP 1997), *rev'd on other grounds*, 161 F.3d 1216 (9th Cir. 1998)[8]; *McVay & Corrigan v. Barnetche* (*In re Barnetche*), 98.2 I.B.C.R. 37 (Bankr. D. Idaho 1998). This is in keeping with the purpose of providing debtors with a "fresh start," and recognizes that denial of discharge is one of the harshest remedies available under bankruptcy laws. *Bernard*, 96 F.3d at 1281; *Palmer v. Downey* (*In re Downey*), 242 B.R. 5, 13 (Bankr. D. Idaho 1999).

The burden of proof rests with the party objecting to discharge. Fed. R. Bankr. P. 4005. Although the bankruptcy court should liberally construe the statute in favor of debtors, it is not required to construe the evidence in favor of the debtor. See *Garcia v. Coombs* (*In re Coombs*), 193 B.R. 557, 560 (Bankr. S.D. Cal. 1996) (holding that the strict construction of a statute in favor of discharge is a rule of "statutory interpretation," not "a rule to apply to consideration of evidence."). Instead, the "party asserting denial of discharge under § 727(a) must

---

[8] The Court of Appeals reversed *Weiner* on an abuse of discretion issue, when the trial court did not reconsider its earlier ruling upon post-trial information that the asset was not undervalued at all. The Bankruptcy Appellate Panel's discussion of the standards applicable to discharge litigation was not impacted.

MEMORANDUM OF DECISION - 14

prove the elements of the cause of action by a preponderance of the evidence and not by a more heightened standard." *Grogan v. Garner*, 498 U.S. 279, 284 (1991); *Beauchamp v. Hoose* (*In re Beauchamp*), 236 B.R. 727, 730 (9th Cir. BAP 1999).

### 1.    Section 727(a)(2).

In order to deny discharge under § 727(a)(2), two elements must be shown to exist within the one-year period prior to filing bankruptcy.  First, there must be a "disposition of property, such as [a] transfer or concealment[.]" *Hughes v. Lawson* (*In re Lawson*), 122 F.3d 1237, 1240 (9th Cir. 1997).  Second, the debtor, through the disposition, must possess the subjective intent to hinder, delay, or defraud a creditor.  *Id.*  With regard to this second element, a finding of actual intent to hinder, delay, or defraud a creditor is required to deny discharge.  *First Beverly Bank v. Adeeb* (*In re Adeeb*), 787 F.2d 1339, 1342 (9th Cir. 1986).  "Constructive fraudulent intent cannot be the basis for denial of a discharge." *Id.*  However, intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *Devers v. Bank of Sheridan, Montana* (*In re Devers*), 759 F.2d 751, 753-54 (9th Cir. 1985).

Trustee's complaint leaves unclear which of Debtor's assets or transfers allegedly fall within the ambit of this provision.  However, the testimony at trial regarding § 727(a)(2) centered on the ATV, the proceeds from the personal

MEMORANDUM OF DECISION - 15

injury settlement, and the horses.  The Court will address each of these assets in turn.

On September 15, 2005, Debtor negotiated the purchase of the Yamaha ATV.  She signed the bill of sale, the application for certificate of title, and all other documents required to complete the purchase. Ex. 7.  She also took possession of the ATV.  The records of the Idaho Transportation Department show, per the application she signed, that Debtor, dba FT Bar Ranch, is the owner of the ATV.  Ex. 8.

Debtor protests, and she and Black insisted at trial that Debtor purchased the ATV for her elderly mother.  While Black evidently used the ATV on occasion, Debtor also had access to, and the greater opportunity and need to use the ATV at all relevant times.  And while there was testimony that Black transferred some funds to Debtor at about the time of the purchase, the documentation offered to prove that these funds were used for the purchase was clearly lacking.  In short, the Court simply declines to believe that Debtor's intent was that Black was to own the vehicle.  Thus, the Court finds that the ATV was purchased by Debtor and that she intended it to be her property.  When she filed for bankruptcy relief on October 14, 2005, the ATV became property of the bankruptcy estate.

MEMORANDUM OF DECISION - 16

The evidence is truly overwhelming that Debtor concealed this asset from Trustee. Debtor did not list the ATV in her sworn schedules, and when questioned by Trustee, both under oath, and informally, she not only repeatedly denied her ownership interest, she disclaimed any knowledge of its existence or purchase. When Trustee visited the ranch property, the ATV was nowhere to be found. Instead, Trustee finally found the ATV at a remote Oregon ranch, along with several other assets that had been in Debtor's possession. Based upon this record, the Court finds that Debtor concealed the ATV from Trustee.

It might be expected that whether Debtor concealed the ATV with actual intent to hinder, delay, or defraud Trustee, or for some other reason, would be a more difficult issue. But all things considered, the answer to this question is clear. The Court finds Debtor harbored the requisite bad intent – her goal was to hide the ATV from Trustee because he intended to take it and sell it.

Debtor denied any knowledge of the ATV, or its purchase and her ownership interest in it, four different times during her Rule 2004 examination by Trustee. She also denied that she signed the application for the certificate of title. Later, in June 2006, Debtor again denied ownership of the ATV or that she had any knowledge of its whereabouts. Debtor testified that, approximately two weeks prior to trial, Debtor's cousin, Tim Black, had delivered the ATV to the ranch in

MEMORANDUM OF DECISION - 17

Oregon where Debtor was residing.  At that time, Debtor was obviously aware of

Trustee's keen interest in, and his search for, the ATV.  Even so, Debtor did

nothing to inform him when she became aware of the ATV's location.

Debtor's approach, even if believed, violated her duties under the

Code.  Under § 521(3), in consideration of the relief provided under the

Bankruptcy Code, Debtor was obliged to cooperate with Trustee as necessary to

enable him to perform his duties.  Although previously denying under oath that her

signature would be found on the application for title for the ATV, at trial, Debtor

identified the signature on that application as her own.  Trial transcript, Vol. III of

IV, p. 148, line 1.  The Court finds that while Debtor was aware of all the details of

the ATV purchase transaction, she lied to Trustee about the extent of her

knowledge.

Based upon all of the evidence, including Debtor's denial of

ownership of the ATV, and of knowledge of the underlying transaction, together

with her failure to promptly inform Trustee when she later became aware of the

ATV's location, the Court finds Debtor intended to conceal the ATV, and to

hinder, delay and defraud Trustee in performing his duty to take possession of and

sell the ATV for the benefit of Debtor's creditors.

MEMORANDUM OF DECISION - 18

A similar conclusion results from an analysis of the evidence concerning Debtor's personal injury claim and her receipt of the settlement proceeds. Only one month prior to filing her bankruptcy petition, Debtor received a $47,000 settlement check. She immediately purchased additional insurance for herself, and made preferential payments to selected creditors. By the time she filed for bankruptcy, she had expended the entire $47,000.

Initially, Debtor did not disclose her personal injury claim or the settlement payment in her bankruptcy schedules. She also did not list the creditor payments she made from these funds on her SOFA. Finally, she did not disclose that she would possibly receive additional settlement funds in the future. Debtor asserts she was completely unaware of the prospect that she would recover anything more from her claim. The Court declines to believe this assertion.

Debtor's personal injuries that served as the basis for her claim were substantial. In addition, $47,000 was a truly significant sum for her to receive, given Debtor's stressed financial situation during the months immediately prior to her bankruptcy filing. Many of her creditors were attempting to collect from her. Even so, Debtor cooly calculated to whom the money should be disbursed, putting a substantial amount of it to her personal use. Receipt of this large sum shortly before filing for bankruptcy belies her position that she did not disclose it because

MEMORANDUM OF DECISION - 19

she "plain didn't even think about it."  Trial Transcript, Vol. III of IV, p. 195, lines 2-3.

The concealment or transfer of an asset is a classic badge of fraud. See *Wolkowitz v. Beverly* (*In re Beverly*), 374 B.R. 221, 235 (9th Cir. BAP 2007); *Rakozy v. Giampedraglia* (*In re Giampedgraglia*), 96.1 I.B.C.R. 7, 8 (Bankr. D. Idaho 1996).  Debtor's failure to advise the Court, Trustee and creditors of her receipt, and how she spent, the settlement proceeds is a classic example of why this is so.  Debtor's failure to acknowledge the existence of a significant personal injury claim on which she had very recently received a large payment is strong circumstantial evidence that she was fraudulently attempting to conceal the claim and payments.  Absent some other credible explanation for Debtor's conduct, the Court finds that Debtor's transfers of the settlement money to creditors and for her own benefit, and her concealment of her receipt of the funds, her personal injury claim, and her potential right to receive additional funds in her bankruptcy papers, was done with the actual, fraudulent intent to hinder, delay or defraud Trustee and her creditors.

Lastly, the evidence clearly shows that Debtor concealed several horses from Trustee.  As previously noted, Debtor did not list any horses on her signed schedules.  At the § 341(a) meeting she lied under oath, claiming that she

MEMORANDUM OF DECISION - 20

no longer owned any horses.  When Trustee initially visited her property she

indicated to him that the horses present there were not hers.  Later, she removed

over 20 horses from the property and transported them to a remote ranch in Eastern

Oregon.  Thus, not only did Debtor attempt to conceal these horses by omitting

them from her schedules and lying about owning them, she physically removed

several of them to a remote location where she knew it would be difficult for

Trustee to find them.

   That Debtor concealed these horses with the actual intent to hinder,

delay, or defraud Trustee is clear.  She knew that if Trustee were to take

possession of these horses he would sell them.  In Debtor's view, because of their

old age and poor health, these horses had nothing more than mere sentimental

value.  Trial Transcript, Vol. IV of IV, p. 17, line 7 through p. 18, line 8.  She

couldn't bear the thought of somebody not feeding them and caring for them, and

then having them put up for auction and having nobody bid on them.  *Id.*  Debtor

conceded that she loved those horses so dearly that she was willing to not tell the

truth about them.  *Id.* at p. 18, line 11.

   Based upon all the evidence, the Court finds Debtor intended to

conceal the horses from Trustee, and to hinder, delay and defraud Trustee in

MEMORANDUM OF DECISION - 21

performing his duty to take possession of and sell the horses for the benefit of

Debtor's creditors.

Simply put, Debtor deserves no discharge because she transferred

and concealed multiple assets from Trustee and her creditors with the actual intent

to hinder, defraud or delay them.

### 2.      Section 727(a)(3)

Section 727(a)(3) has two parts.  The first condemns a debtor's

concealment, destruction, mutilation and falsification of recorded information.

*Sterling Int'l, Inc. v. Thomas* (*In re Thomas*), 03.3 I.B.C.R. 178, 183 (Bankr. D.

Idaho 2003).  The second part of the statute punishes the debtor's failure to "keep

or preserve" adequate records.  *Lansdowne v. Cox* (*In re Cox*), 41 F.3d 1294 (9th

Cir. 1994).  It is this second aspect of § 727(a)(3) that Trustee invokes in this

action.

In order to establish a *prima facie* case under § 727(a)(3) for denial

of discharge, a creditor or trustee must show by a preponderance of the evidence

"(1) that the debtor failed to maintain and preserve adequate records, and (2) that

such failure makes it impossible to ascertain the debtor's financial condition and

material business transactions."  *Id.* at 1296.  What constitutes adequate books and

records must be decided on a case-by-case basis, depending upon the Debtor's

business operations and sophistication. *First Security Bank of Helena v. Hirengen*

(*In re Hirengen*), 112 B.R. 382, 385 (Bankr. D. Mont. 1989) (citing *Stewart*

*Enterprises, Inc. v. Horton* (*In re Horton*), 621 F.2d 968 (9th Cir. 1980)). If the

proof satisfies these elements, the burden then shifts to the debtor to "justify the

inadequacy or nonexistence of the records." *In re Cox.* 41 F.3d at 1296-97 (citing

*Western Wire Works, Inc. v. Lawler* (*In re Lawler*), 141 B.R. 425, 428-29 (9th Cir.

BAP 1992) (stating that a debtor must "provide a credible explanation" for failure

to keep records)).

> As to a debtor's duty to keep and preserve records, *Cox* instructs:

> > If the extent and nature of the debtor's transactions
> > were such that others in like circumstances would
> > ordinarily keep financial records, she must show more
> > than that she did not comprehend the need for them. In
> > such cases, the justification must indicate that because
> > of unusual circumstances, the debtor was absolved
> > from the duty to maintain records herself.

*In re Cox*, 41 F.3d at 1297 (citations omitted).

> As the owner of multiple businesses, it could be expected that

Debtor's financial books and records would be fairly complex and comprehensive,

certainly more so than those of the average consumer debtor. However, the

evidence showed that Debtor's bookkeeping practices were seriously lacking in

MEMORANDUM OF DECISION - 23

sophistication, and records of Debtor's financial dealings in her firefighting and horse businesses are virtually non-existent.

Debtor testified that her common practice with respect to her personal affairs was that, when she paid her bills and expenses, she would enter the payment amount on a simple spreadsheet, and then discard any bill, invoice or statements of account.[9]  Debtor claims she is leasing Ranch Property from her mother, however, no lease agreement or other evidence of this arrangement was produced or, apparently, exists.  Debtor has retained no records of any of the payments she allegedly made to her mother for rent.  Likewise, apart from the cryptic reference "Ocwen Viola Black" in Debtor's spreadsheets, there are no records of rent payments she allegedly made directly to Ranch Property's mortgage holder.  As a result, aside from her meager spreadsheets, Trustee did not have any documentation about Debtor's personal financial condition.

And, while Debtor's personal accounting practices were poor, her business records were worse.  Debtor was responsible for all the paperwork associated with Bachman Transport.  However, those records were not necessarily

---

[9]  To exemplify this approach, Debtor's spreadsheets for the years 2004 and 2005 were admitted into evidence.  For most months during this time, only two or three entries are recorded.  In addition, it appears Debtor had little regard for the corporate form of her businesses, as entries for Bachman Transport, Paint-N-Place Ranch, and Debtor's personal affairs all appear within this single accounting document.  To say this is a cavalier approach to keeping records would be an understatement.

MEMORANDUM OF DECISION - 24

complete nor organized.  As Debtor was negotiating the sale of Bachman

Transport, it became apparent that she had not filed taxes for the business for the

previous three years.  The buyer requested that she file those tax returns, prior to

closing the sale.  Debtor hired Camp to assist her in compiling and organizing the

records for the tax accountant - a task that took Camp several months to complete.

After the sale of the company was complete, Debtor simply handed *all* of the

records over to Rocky Mountain; she did not even keep any copies of Bachman

Transport's tax returns or bank statements for her own personal reference.  Thus,

despite her control of Bachman Transport for nearly twenty years, Debtor claims

to have absolutely no corporate records.

While records of Bachman Transport allegedly existed at one point,

the same cannot be said for Debtor's other business, Paint-N-Place Ranch.  Debtor

testified that all the information concerning her horse business and transactions

were kept "in her head," and no files or accounts concerning transactions involving

individual horses were ever maintained.  Trial Transcript, Vol. IV of IV, p. 73, line

20.  The majority of the horse sales were accomplished on a cash basis, and not

documented by an invoice, bill of sale, or in any other manner.

Given this situation, Trustee has adequately shown that Debtor failed

to keep or preserve adequate records to allow him or the creditors to ascertain

MEMORANDUM OF DECISION - 25

Debtor's financial condition and business transactions for purposes of § 727(a)(3).

It was therefore Debtor's burden to justify, or to offer a credible explanation for,

her deficient records. Debtor failed to do so.

In response to Trustee's proof concerning Debtor's failure to keep

adequate financial records of Bachman Transport, Debtor merely explained that

she thought sending the records to the new owners of the company was the right

thing to do.[10]  Trial Transcript, Vol. IV of IV, p. 72, line 25.  Debtor's excuse is

tantamount to merely stating that she did not comprehend a need to keep those

records.  However, as *Cox* instructs, absent unusual circumstances, which do not

exist here, Debtor must show that she was absolved of a duty to keep records of

Bachman Transport.  *In re Cox*, 41 F.3d at 1297.  Given Debtor's sophistication,

business acumen, daily involvement in Bachman Transport, and her continued

involvement in Rocky Mountain, her bare excuse in this instance is simply

insufficient.

Moreover, Debtor has given no explanation or justification for her

failure to keep records concerning Paint-N-Place Ranch.  Nor has she offered any

_____

[10]  Rocky Mountain, as the buyer of Bachman Transport, became the new owner
of the company.  However, as consideration for the sale of Bachman Transport, Debtor
received a 20% ownership interest in Rocky Mountain.  In other words, Debtor had a
significant ownership interest in the parent company which controlled Bachman
Transport and thus, retained an ownership interest in Bachman Transport.

MEMORANDUM OF DECISION - 26

reason for her inadequate records concerning her personal financial affairs and her alleged "lease" arrangement of Ranch Property. "The law does not require impeccable bookkeeping or extravagant accounting measures, but it does require at least a fundamental undertaking to maintain proper records." *Bergeron v. Ross* (*In re Ross*), 367 B.R. 577, 582 (Bankr. W.D. Ky. 2007). Debtor's efforts simply don't measure up. Thus, Debtor's failure to keep and maintain financial documentation of her personal and business affairs is an alternative ground upon which to deny her a discharge.

### 3.    Section 727(a)(4)(A)

Denial of discharge under § 727(a)(4)(A) requires proof that the debtor knowingly and fraudulently made a false oath or account in the course of the bankruptcy proceedings. *Aubrey v. Thomas* (*In re Aubrey*), 111 B.R. 268, 274 (9th Cir. BAP 1990). To deny discharge under § 727(a)(4)(A) for a false oath, the trustee or creditor must prove by a preponderance of the evidence that: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. *Roberts v. Erhard* (*In re Roberts*), 331 B.R. 876, 882 (9th Cir. BAP 2005), *aff'd* 241 Fed. App'x. 420 (9th Cir. 2007).

MEMORANDUM OF DECISION - 27

An actionable false oath need not occur through live testimony. False statements in, or omissions from, a debtor's bankruptcy schedules and statement of affairs, which are signed under penalty of perjury, will suffice. *Id.*; see also, *Palmer v. Downey* (*In re Downey*), 242 B.R. 5, 13 (Bankr. D. Idaho 1999). "A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Roberts*, 331 B.R. at 883; *Fogal Legware of Switzerland, Inc. v. Wills* (*In re Wills*), 243 B.R. 58, 62 (9th Cir. BAP 1999). Moreover, a false statement or omission may be material even in the absence of direct financial prejudice to creditors. *Roberts*, 331 B.R. at 883. An act is done knowingly if it is done deliberately and consciously. *Id.* The false oath must be made with actual intent to defraud; constructive fraudulent intent is insufficient to warrant denial of discharge. *Devers*, 759 F.2d at 753; *Roberts*, 331 B.R. at 884. However, a debtor's fraudulent intent may be established by circumstantial evidence, including by inferences drawn from the debtor's course of conduct. *Roberts*, 331 B.R. at 884.

Again, Trustee's Second Amended Complaint does not specifically identify which of Debtor's statements or omissions were allegedly knowingly and fraudulently false so as to provide a basis for denial of discharge. Even so, there

MEMORANDUM OF DECISION - 28

were a variety of representations and omissions made by Debtor, which as shown

in the evidence, would independently qualify to deny her a discharge.

      For example, Debtor's Schedules and SOFA fail to disclose

numerous assets and transactions.  Among the assets omitted from her schedules

are several paint horses, the 2005 Yamaha Kodiak ATV, and the personal injury

claim.  In addition, Debtor's SOFA failed to disclose Debtor's receipt, and prompt

disbursement, of the $47,000 personal injury settlement payment only one month

before filing her petition.[11]

      Until the eve of trial, Debtor maintained that she no longer owned

horses, having disposed of all of them prior to bankruptcy.  Debtor listed no horses

in her schedules.  At the § 341(a) meeting, when asked whether she owned any

horses, Debtor responded, "No I don't.  I used to, yes, but I don't now.  And I

haven't for a long time."  Ex. 4, p. 17.  However, at trial, several witnesses

testified to the contrary.  After listening to that testimony, Debtor admitted that she

owned three horses on the date she filed her bankruptcy petition.  Trial Transcript,

Vol. IV of IV, p. 14, line 21-22.  Thus, Debtor's testimony at the § 341(a) meeting

---

[11]  The personal injury claim and any potential settlement awards were not listed
in Debtor's original schedules.  On March 23, 2006, Debtor amended her Schedules B
and C to include the personal injury claim and to claim the entire value as exempt.  Post-
petition, Sulzer sent Debtor an additional settlement check in the amount of $49,600.
This check was received and is being held by Trustee, pending resolution of this matter.

MEMORANDUM OF DECISION - 29

was false.  Moreover, at trial, Debtor admitted that her testimony at the § 341(a)

meeting, and similar statements made at her deposition regarding ownership of the

horses, were untruthful.  Trial Transcript Vol. IV of IV, p. 16, lines 6-23.

Debtor now claims the horses she owned when she sought

bankruptcy relief were of little or no value.  This is of no moment – her false

statement at the § 341(a) meeting regarding ownership of the horses is still

material.  *See Roberts*, 331 B.R. at 883 (a false statement or omission may be

material even in the absence of direct financial prejudice to creditors.)

In addition, the Court finds that Debtor knowingly omitted the horses

from her schedules.  At trial, she testified that, "I listed them on my schedule

[given to her attorney].  They didn't get transferred on to the typed schedule."

Trial Transcript Vol. IV of IV, p. 15, line 11-12.  When asked whether Debtor

noticed the omission prior to signing her petition, she acknowledged the omission,

and explained, "I discussed it with [my attorney] and signed it."  Trial Transcript

Vol. IV of IV, p. 15, line 25.  Under these circumstances, it is clear Debtor acted

knowingly.

Moreover, based upon all the evidence, the Court declines to believe

Debtor's version of the facts and finds that Debtor's intent in failing to list the

horse in her schedules was fraudulent.  If Debtor did not intend to conceal her

MEMORANDUM OF DECISION - 30

interest in the horses, and their omission from the schedules was merely her

attorney's mistake, Debtor must explain why she later denied, on multiple

occasions, ownership of any horses.[12]  Although the Court understands that Debtor

owned the horses in question for many years and may have considered them to be

family pets, Debtor's love and concern for these animals, and their alleged lack of

significant value, is not an adequate justification for her decision to lie about them.

       The Court also finds that Debtor knowingly and fraudulently made a

false oath or account with respect to the Yamaha ATV.  As the Court discussed

above, it finds that Debtor owned the ATV on the date she filed her bankruptcy

petition, and it therefore became an asset of the bankruptcy estate.  Debtor did not

disclose the ATV in her schedules, which she signed under penalty of perjury, thus

making a false oath.  See *Roberts*, 331 B.R. at 882.  Debtor then repeatedly denied

knowledge of the purchase or existence of the ATV in her Rule 2004 examination.

Omitting the ATV from her schedules, and her subsequent denial concerning any

knowledge of this vehicle, is material because it relates to an asset of the

bankruptcy estate.  *Id.* at 883.  And this is not the case of an innocent debtor who

merely overlooked an asset when preparing her schedules, and who upon

---

[12]  Although Debtor amended her schedules to reflect her interest in a personal
injury claim after Trustee became aware of its existence, Debtor has never amended her
schedules to reflect an ownership interest in any horses.

MEMORANDUM OF DECISION - 31

discovery of the error, promptly corrected the mistake.  This action involves a debtor who knowingly, deliberately, and repeatedly denied any knowledge of the asset, although the evidence indisputably demonstrates she purchased and possessed it.  In response to Trustee's repeated attempts to locate the ATV and learn more about its purchase, Debtor baldly denied all knowledge of the purchase and gave false testimony regarding her signature on the purchase documents.  As the Court found above, Debtor made these false oaths with the intent to conceal the ATV from the Trustee, so that he could not take it from her and sell it.  Debtor's failure to list the ATV on her schedules and subsequently giving false testimony at the 2004 examination was therefore fraudulent.

Debtor also knowingly and fraudulently made false oaths regarding her interest in the personal injury claim and settlement proceeds.  Debtor did not disclose this personal injury claim in her original schedules.  She also failed to acknowledge on her SOFA her receipt and subsequent disbursement of the $47,000 in settlement money, which occurred shortly before her petition was filed. Debtor's omissions with respect to the personal injury settlement proceeds are material because they bear a relationship to the existence of estate property.

Again, Debtor's failure to list her personal injury claim and receipt of proceeds in her schedules was knowing.  Although Debtor cannot precisely

MEMORANDUM OF DECISION - 32

document how this money was spent, her testimony at trial indicates that the bulk

of this settlement was paid out preferentially to Bachman Transport employees and

to Ocwen Financial as rent on Ranch Property.  As a result, Debtor has not

provided an adequate explanation for why she could not have disclosed these

disbursements on her SOFA.  The only fair inference to be drawn from all the

evidence is that Debtor intended to hide the personal injury claim, and her receipt

and disposition of $47,000 in settlement proceeds, from Trustee and her creditors.

Debtor thereby engaged in fraud.

In sum, Debtor shall also be denied discharge because she knowingly

and fraudulently made false oaths and accounts by omitting multiple assets from

her bankruptcy schedules and subsequently giving false and misleading testimony

about those assets at her § 341(a) meeting and her 2004 examination.

## II.    Debtor's Fraudulent Transfers to Black

### A.    Additional Facts

In October 2000, Debtor purchased a 2000 Sundowner horse trailer.

Initially, there was no lien on the trailer.  Prior to purchasing the horse trailer,

Debtor's roommate, Mike Miller, borrowed $10,000 from a friend for the down

MEMORANDUM OF DECISION - 33

payment on a Volvo truck.  Due to his poor credit, Debtor co-signed on the note to

purchase the Volvo truck.  Apparently, Miller defaulted on the note, a judgment

was awarded to the creditor against Debtor for the balance due on the note, and in

2001, the Canyon County Sheriff seized the trailer.  In December 2001, Black

allegedly loaned Debtor sufficient funds to reclaim the trailer from the execution.

Debtor granted Black a security interest in the trailer to secure this loan.

Over the next few years, Debtor received various personal loans

from Black to help finance the operations of Bachman Transport.  In July 2004,

when Debtor could not repay those loans, Debtor transferred the trailer to Black in

partial satisfaction of the debt.  Ex. 13.  Around the same time Black recorded her

ownership interest in the trailer, she also took liens on several busses and a water

truck used by Bachman Transport.  The titles for those vehicles indicate that the

liens were recorded on August 10, 2004.  Ex. 11.


   **B.      Analysis**

Trustee has alleged that prior to filing her bankruptcy petition,

Debtor fraudulently transferred several items of personal property to her mother,

Viola Black.  Trustee seeks to avoid these transfers pursuant to §§ 544(b) and

548(a)(1) of the Code.

MEMORANDUM OF DECISION - 34

1.      **Section 544(b)**

Generally speaking, § 544 of the Bankruptcy Code empowers a

bankruptcy trustee to invoke state law to avoid and recover certain types of

prepetition transfers of a debtor's property.  For example, under § 544(b), "the

trustee may avoid any transfer of an interest of the debtor in property or any

obligation incurred by the debtor that is voidable under applicable state law by a

creditor holding an unsecured claim . . . ."  While the "strong arm" powers of

§ 544(a) operate without regard to the existence of a creditor who could, absent

bankruptcy, seek to avoid a transfer under state law, the trustee's powers under

§ 544(b) require pleading and proof of the existence of such an unsecured creditor,

as well a showing that applicable state law grants that creditor the right to avoid

the transfer.  *Elsaesser v. Raeon* (*In re Goldberg*), 99.2 I.B.C.R. 62, 65 (Bankr. D.

Idaho 1999).

One typical use of § 544(b) is to avoid transfers pursuant to Idaho's

version of the Uniform Fraudulent Transfer Act.  *See, e.g., Spurgeon v. Hairston*

(*In re Hairston*), 97.3 I.B.C.R. 70 (Bankr. D. Idaho 1997) (use of Idaho Code § 55-

914); *Rakozy v. Giampedraglia* (*In re Giampedraglia*), 96.1 I.B.C.R. 7 (Bankr. D.

Idaho 1996) (use of Idaho Code §§ 55-906, 913 and 914).  Here, Trustee alleges

Debtor transferred her horse trailer and several other vehicles to her mother in

MEMORANDUM OF DECISION - 35

violation of Idaho Code §§ 55-913 and 914.  These sections provide, in pertinent

part:

> § 55-913.  Transfers fraudulent as to present and future
> creditors. –  (1) A transfer made or obligation incurred
> by a debtor is fraudulent as to a creditor, whether the
> creditor's claim arose before or after the transfer was
> made or the obligation was incurred, if the debtor made
> the transfer or incurred the obligation:
>> (a) With actual intent to hinder, delay, or
>> defraud any creditor of the debtor. . .
>
> * * *
>
> § 55-914.  Transfers fraudulent as to present creditors.
> – (1) A transfer made or obligation incurred by a
> debtor is fraudulent as to a creditor whose claim arose
> before the transfer was made or the obligation was
> incurred if the debtor made the transfer or incurred the
> obligation without receiving a reasonably equivalent
> value in exchange for the transfer or obligation and the
> debtor was insolvent at that time or the debtor became
> insolvent as a result of the transfer or obligation.

Idaho Code §§ 55-913, 914.

Whether a particular transaction is fraudulent is a question of fact to

be determined from all the circumstances surrounding the transaction.  *Mohar v.*

*McLelland Lumber Co.*, 501 P.2d 722, 726 (Idaho 1972); Idaho Code § 55-908.

Actual fraud must be proven by clear and convincing evidence.  *Mohar*, 501 P.2d

at 726.  However, because it is impracticable to demonstrate actual fraudulent

intent on direct evidence, courts frequently infer fraudulent intent from the

MEMORANDUM OF DECISION - 36

circumstances surrounding the transfer. *Acequia, Inc. v. Clinton* (*In re Acequia*),
34 F.3d 800, 806 (9th Cir. 1994). In considering the surrounding circumstances,
courts take particular note of certain recognized indicia or badges of fraud. *Id.*
"The presence of a single badge of fraud may spur mere suspicion; the confluence
of several can constitute conclusive evidence of actual intent to defraud, absent
'significantly clear' evidence of a legitimate supervening purpose." *Id.* "[O]nce a
trustee establishes indicia of fraud in an action under § 548(a)(1), the burden shifts
to the transferee to prove some 'legitimate supervening purpose' for the transfer at
issue." *Id.*

       Numerous badges of fraud surround Debtor's transfers[13] of the horse
trailer and other vehicles to Black. Among the indicia of fraud is the close
relationship between Debtor and Black, the fact that Debtor retained possession of
the vehicles after the transfers, the financial distress that Debtor was in at the time
the transfers were made, and the value that Debtor allegedly received for the
transfers. See Idaho Code § 55-913(2). Together, these factors shed significant
light on Debtor's actual intent with respect to these transfers.

---

     [13] Idaho's version of the Uniform Fraudulent Transfer Act defines "transfer" as
"every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of
disposing of or parting with an asset or an interest in an asset, and includes payment of
money, release, lease, and creation of a lien or other encumbrance." Idaho Code § 55-
910(12).

MEMORANDUM OF DECISION - 37

First, Black is Debtor's mother.  While this close familial relationship does not necessarily create a presumption that all transfers between Debtor and Black are fraudulent, it does invite close scrutiny of the transactions. *Mohar*, 501 P.2d at 726.  With respect to the busses, Debtor claimed that she did not help her mother get the liens, but that she did not mind her doing it.  Trial Transcript, Vol. III of IV, p. 169, line 21 through p. 179, line 9.  Debtor understood that if Black had liens on the busses it would secure the equity.  In her deposition, Debtor indicated that if anybody was to get the equity out of those vehicles, she wanted it to be her mother as opposed to somebody else.  *Id.* at p. 171, lines 20-24.

Next, Black's interest in these vehicles was on paper only.  At all times after the transfers, Debtor retained exclusive possession and control of the trailer and the other vehicles.  Apparently, Black made no effort to use the vehicles, nor did she take any steps to foreclose upon them to extract whatever value they had.

As to the value Debtor received in exchange for these transfers, the only evidence in the record is the testimony of Debtor and Black, that Black loaned Debtor money to recover the trailer from the sheriff's execution and at various other times to help finance the operations of Bachman Transport.

MEMORANDUM OF DECISION - 38

However, at trial Black could not recall how much she had loaned to finance Bachman Transport, stating that she had lost too much of her memory.  Trial Transcript, Vol. IV of IV, p. 125, lines 6-12.  Neither Debtor or Black provided any paper documentation of the loan for the horse trailer or any of the other sizable loans to Bachman Transport.  Because Black could not even give the Court an approximation of how much she had loaned Debtor and the record is devoid of any concrete evidence of the loans, any attempt to determine if Debtor received reasonably equivalent value for these transfers would be mere speculation.

In addition to these factors, prior to the time Black recorded her liens on the busses, Debtor did some maneuvering with respect to the names on the title. When the busses were originally purchased, the titles were put in the names of Debtor, Krupp, and Debtor's son.  However, sometime in 2004, Debtor removed her son's and Krupp's names from the titles, leaving title solely in herself.[14]  Krupp testified that he did not consent to have his name removed, and that he did not find out about it until after it was done.  Debtor testified to the contrary, that it was done in his presence with his permission and knowledge.  Given their respective

---

[14]  Initially, the Court was perplexed why the Idaho Transportation Department would allow anyone to remove a name from the certificate of title without that person's written authorization.  Both Debtor and Krupp explained that the original title listed the three names with the disjunctive "or" rather than the conjunctive "and."  Because of this, any one of the three could have individually authorized changes to the title.

MEMORANDUM OF DECISION - 39

financial interests in this case, the Court is not inclined to give much credence to either's testimony regarding whether there was permission or consent to remove Krupp's name from the title. However, the fact remains that his name was removed, and shortly thereafter, Black recorded liens on all of the busses.

Together, these factors are strong circumstantial evidence that Debtor made these transfers with actual intent to hinder, delay, or defraud her creditors. Having met his initial burden, the onus shifted to Black, as the transferee, to show a legitimate supervening purpose for the transfers. See *In re Acequia*, 34 F.3d at 806. Black has failed to meet this burden.

To avoid these transfers under § 544(b), in addition to showing that Debtor harbored the requisite intent to hinder, delay, or defraud her creditors, Trustee must also prove the existence of a creditor which would have a right to seek such avoidance. Debtor's bankruptcy petition and schedules were admitted into the record by stipulation. In her Schedule F, Debtor listed over 75 unsecured creditors. Having found that Debtor acted with actual intent to hinder, delay, and defraud her creditors, each of these listed creditors would have a right to avoid these transfers under Idaho Code § 55-913. As a result, Trustee is able to avoid these transfers under § 544(b) as well.

### 2.    Section 548(a)(1)

MEMORANDUM OF DECISION - 40

In contrast to the need to rely upon state law when seeking to avoid a transfer pursuant to § 544(b), the Bankruptcy Code directly empowers a trustee to avoid transfers of a debtor's property made within one year before the date of the filing of a bankruptcy petition if such transfers were made with the actual intent to hinder, delay, or defraud any entity to which the debtor was indebted. 11 U.S.C. § 548(a)(1). The Court has already found that Debtor transferred the horse trailer and other vehicles to Black with the actual intent to hinder, delay, and defraud her creditors. Debtor transferred the horse trailer to Black on July 28, 2004. Ex. 13. The liens on the busses were recorded on August 10, 2004. Ex. 11. Debtor did not file her petition until October 14, 2005. Because these transfers did not occur within the one year prior to the date Debtor filed her bankruptcy petition, Trustee cannot avoid these transfers pursuant to § 548(a)(1).

## III.    Title to Ranch Property

### A.    Additional Facts

Much of the litigation in this action concerned the ownership of the real property located at 23885 Boehner Road, Wilder, Idaho, which has been referred to herein as "Ranch Property."[15] The parties differ in their opinions as to

---

[15] In its entirety, Ranch Property consists of approximately 63 acres. This land is divided into five smaller parcels containing approximately 5, 10, 15, 16, and 17 acres,

MEMORANDUM OF DECISION - 41

who is the rightful owner of Ranch Property.  The Court, after considering the

testimony and the evidence, finds the facts to be as follows with respect to Ranch

Property.

Shortly after losing her ranch in Nampa, Idaho to foreclosure in

March 2002, Debtor became aware of Ranch Property, which was owned by Jesse

Rhode ("Rhode") and Julie Christensen ("Christensen"), a divorced couple.  It

consisted of a house, a large horse barn, corrals, and several acres of irrigated hay

fields.  At trial, Debtor explained that while she would have liked to have

purchased it, given her financial condition at the time, she was not in a position to

do so.  Instead, she was only searching for a suitable property to rent.  Trial

Transcript, Vol. IV of IV, p. 56, lines 15-16.  Debtor decided to approach her

mother, Black, and proposed that Black buy Ranch Property as an investment, and

that Debtor would rent it from her.  Black purportedly agreed to this arrangement.

Black grew up on a farm, and had a keen interest in horses and

ranches.  For most of her married life, she and her husband owned and operated a

large ranch in the Grandview, Idaho area.  As she and her husband got older, they

started to scale back, and purchased a smaller parcel, approximately ten acres, in

---

respectively.  It is unclear from the record whether there are fences or other demarcating
lines separating these various parcels.  For identification purposes, the Court uses the
term "Ranch Property" to refer to all of these parcels collectively; specific parcels will be
identified by size.

MEMORANDUM OF DECISION - 42

the town of Grandview.  After Mr. Black retired, his health began to fail.  Black

testified that she and her husband were making trips into Boise almost weekly to

see doctors for her husband's heart condition and other health related problems.

Trial Transcript, Vol. IV of IV, p. 113, lines 7-10.  The weekly trips became too

much for the couple, and they decided to sell their small ranch in Grandview and

move to Boise to be closer to Mr. Black's doctors and the hospitals.  They

purchased a small home in Boise.  Later, they turned the Boise home into a rental,

and purchased a mobile home in Nampa.

Black was almost 78 years old when Debtor approached her with the

proposal about Ranch Property.  Her husband's health was very poor.  By that

time, he had undergone several open-heart surgeries, had suffered a stroke, and

was beginning to develop dementia.  *Id.* at p. 117, lines 3-5.  Black and her

husband were living off a small pension and social security.  Despite these

circumstances, Black "sure liked the looks of [Ranch Property,]" and wanted to

pursue it.  *Id.* at p. 115, lines 21-22.

Debtor began negotiating the various terms of its purchase with

Rhode.  According to his testimony, which the Court finds to be very credible, all

negotiations regarding the sale of Ranch Property were done either directly

between Rhode and Debtor, or through the realtor, Alan McRae.  Black had no

MEMORANDUM OF DECISION - 43

contacts with Rhode and did not materially participate in these negotiations. A

purchase price was established, and it was decided that part of that price would be

financed by Rhode, with the balance to come from a new loan through a

commercial lender and serviced by Ocwen Financial.

On June 27, 2002, all of the parties met at a title company to close

the deal. It was at the closing that Rhode first met Black and became aware of her

involvement in the deal. At the closing, Black executed a promissory note,

secured by a mortgage, for $137,000 in favor of Rhode. Ex. 27. According to the

terms of that note, Black agreed to pay Rhode approximately $14,000 annually

over the next ten years. At the same time, Black also executed a deed of trust to

secure an additional note to the lender in the amount of $317,900. Ex. 28. Rhode

and Christensen signed warranty deeds in favor of Black.[16] Ex. 29 and 30. Rhode

testified that at the closing he was told by Debtor and Black that title would be put

in Black's name as a mere formality, until they sold some other property in

Nampa, at which point they would transfer Ranch Property into Debtor's name.

Significantly, Rhode understood that Debtor was going to make all the payments,

---

[16] There were two purchase agreements and two warranty deeds for this
transaction. Together, the agreements and deeds describe the entirety of Ranch Property.
At trial, Rhode could not recall why this transaction was structured in this fashion, nor is
it readily apparent to the Court why it was done. Whatever the reason, this documentary
approach is not relevant to the Court's disposition.

MEMORANDUM OF DECISION - 44

and that Debtor was the "true owner."  Trial Transcript, Vol. I of IV, p. 68, lines

11 through 25.[17]

After the closing, Debtor took possession of Ranch Property.

Debtor took up residence in the master bedroom of the main house, and moved her

horses onto the pastures.  Over the next few years, various other individuals

resided at Ranch Property with Debtor.  Sandy Black, one of Debtor's cousins,

moved into one of the smaller bedrooms with her boyfriend, Shawn Boyce.  Sandy

Black testified that she resided at Ranch Property from the summer of 2002 until

September 2006.  Trial Transcript. Vol. I of IV, p. 173, line 24 through p. 174, line

3.  In June 2003, Krupp, Debtor's boyfriend, moved into the master bedroom with

Debtor.  He resided in the house with Debtor until December 2004.  Trial

Transcript, Vol. II of IV, p. 9, lines 16-18.  While she was an occasional, perhaps

even frequent, visitor to Ranch Property, at no time did Black reside there.

Debtor was responsible for all work and maintenance required on

Ranch Property.  She operated her horse breeding and training business, Paint-N-

Place Ranch, at Ranch Property, and she boarded several horses owned by others

---

[17]  Debtor and Black dispute that it was their intent that Debtor own the property,
and insist it was always intended that Black alone was the owner.  Simply put, in reciting
the facts above, the Court has engaged in a credibility assessment.  The Court believes
the facts are as recited, and declines to believe Debtor's and Black's version of this story
to the extent they differ.

MEMORANDUM OF DECISION - 45

there, including those belonging to Camp and Sandy Black. Debtor did not charge

rent to the individuals that stayed at Ranch Property, but everybody was expected

to help out with the chores and the horses when they could.

On May 30, 2003, Black sued Rhode and Christensen in state court,

alleging that some irrigation equipment had been removed from Ranch Property in

breach of the real estate purchase and sale agreement. Ex. 105. At trial, Rhode

testified he was surprised to learn that Black was the named plaintiff in that action,

as it was his impression that it was Debtor who sued him and his ex-wife. Rhode

and Christensen ultimately prevailed in that action, and the state court awarded

attorneys fees and costs against Black.

In March 2005, several parcels of Ranch Property were sold. On

March 10, 2005, Black conveyed the 15-acre parcel to a Mr. and Mrs. Renteria.

Ex. 101. On March 31, 2005, Black conveyed the 16-acre parcel to a Mr. and

Mrs. Escobar. Ex. 102. These warranty deeds are the only evidence in the record

concerning these transactions. On March 17, 2005, Black conveyed the 17-acre

parcel to Debtor. However, in contrast to the conveyances to the Renterias and the

Escobars, the conveyance to Debtor was by quitclaim deed. The 5-acre parcel and

the 10-acre parcel remained titled in Black's name.

**B.    Analysis**

MEMORANDUM OF DECISION - 46

Idaho law presumes that the holder of title to property is the legal owner of that property. *Luce v. Marble*, 127 P.3d 167, 173 (Idaho 2005); *Russ Ballard & Family Achievement Inst. v. Lava Hot Springs Resort, Inc.*, 548 P.2d 72, 79 (Idaho 1976). Thus, "[o]ne who would claim the ownership of property of which the legal title stands or [sic] record in another . . . must establish such claim by evidence that is clear, satisfactory and convincing." *Russ Ballard*, 548 P.2d at 79; see also, *Luce*, 127 P.3d at 173 (holding that one may overcome the presumption of record title only by establishing rights to the property by clear and convincing evidence). Whether sufficient evidence has been presented is a question to be determined by the trial court, and that court's findings will not be disturbed if there is substantial and competent evidence to support the court's findings, even though the evidence may be conflicting. *Hettinga v. Sybrandy*, 886 P.2d 772, 774 (Idaho 1994); *Jolley v. Clay*, 646 P.2d 413, 418 (Idaho 1982).

Trustee argues that Debtor is the true and lawful owner of Ranch Property, and that Black never held any ownership interest in it, despite the status of her record title. Debtor and Black take the contrary position, insisting that Black was the original purchaser, that Black received title to the entire property, and that Debtor merely rented the property from Black.

MEMORANDUM OF DECISION - 47

Most of the evidence and testimony regarding ownership of Ranch Property is conflicting.  Significantly, the Court was not offered any documentation concerning who paid mortgage payments or property taxes on Ranch Property.  But the record is clear on some very important points.  For example, in June 2002, Debtor, Black, Rhode, and Christensen all met at the title company to close the sale of the property.  At that time, Rhode and Christensen executed warranty deeds to Black for the Ranch Property, which were promptly recorded.  See Ex. 29 and 30.  Thus, under Idaho law, as the title holder of record, Black is the presumptive legal owner of Ranch Property.

However, there is an abundance of competent, credible evidence that Black and Debtor actually intended that Debtor hold the beneficial interests in Ranch Property.  For example, Trustee points out that Debtor had continuous and usually exclusive possession of Ranch Property.  It is undisputed that after the closing, Debtor took possession of Ranch Property, operated her business at the ranch, and moved her horses onto the pastures and her personal belongings into the house.  Black did not reside on the property.  She occasionally visited, sometimes staying overnight.

Trustee also indicated that Debtor exercised control over the property.  Debtor managed Ranch Property, performed virtually all of the work

MEMORANDUM OF DECISION - 48

done there, and maintained the house, the barn, and the hay fields.  The testimony

showed that Debtor made monthly payments, not to Black, but rather directly to

Ocwen Financial.  When Debtor fell delinquent in her payments, the lender sent

Debtor, not Black, a notice of foreclosure.  Black also testified that when default

notices on the mortgage were sent, she did not step in and begin making payments,

but rather left all financial arrangements to Debtor to handle.

        Debtor's individual income tax returns for the years 2002 and 2003

are further evidence that she was intended to be the owner of Ranch Property.  Her

depreciation schedules for these years list the barn and the house on Ranch

Property together with the underlying land.  Ex. 40 and 41.  Although Debtor did

not depreciate the land and the house in those years, Debtor took $1,160 and

$1,237 depreciation on the barn in 2002 and 2003, respectively.  *Id*.  Black's

individual income tax returns are not available to the Court.  She testified that

from 2002 to the present, she has not filed any income tax returns.

        In addition, Trustee's witnesses at trial testified that Debtor had

represented herself to others to be the owner of Ranch Property.  Most significant

to the Court, as described above, was the testimony of Rhode.  The Court can

discern no reason why Rhode would be other than an objective, truthful witness.

The Court believes his testimony that Debtor negotiated the land deal, that it was

MEMORANDUM OF DECISION - 49

represented to him that Debtor, not Black, would pay the deferred portion of the

purchase price to him, that both Black and Debtor acknowledged at closing that

Black's name on the deeds was intended to be a "formality," and that he

understood Debtor to be the "true owner."

While the evidence is conflicting, the Court finds that Trustee has

shown Debtor was intended to be the owner of Ranch Property by a clear and

convincing quantum of evidence.  Accordingly, the Court will enter a judgment

quieting title in the 5- and 10-acre parcels which remain in  Black's name in favor

of Trustee.[18]


## IV.    Avoidance of Camp's Security Interest

### A.    Additional Facts

Prior to filing her bankruptcy petition, Debtor owned a 2000 Ford

F350 pickup which she used as her primary vehicle.  Ford Motor Credit Company

held a lien on the vehicle.  In 2005, Debtor fell delinquent in her payments, and

the lienholder informed her that it intended to repossess the vehicle.  Debtor

---

[18]  By this holding, the Court does not intend to disturb the validity of the
conveyances of the 15- and 16-acre parcels made by Black to Renterias and Escobars,
respectively.  In addition, the Court's decision does not impact the efficacy of Black's
conveyance of the 17-acre parcel to Debtor by quitclaim deed.  Of course, under
§ 541(a), that parcel became property of the bankruptcy estate when Debtor filed her
bankruptcy petition.

MEMORANDUM OF DECISION - 50

testified that she tried to find somebody to help her catch up on the payments.
Because her mother was "already tapped out," she approached Camp and Hall.
Trial Transcript, Vol. III of IV, p. 115, line 1.

On February 25, 2005, Debtor and Camp signed an "Agreement
Letter" and a "Uniform Commercial Code - Security Agreement." Ex. B. These
documents purport to grant Camp a security interest in Debtor's truck in exchange
for a loan by Camp to Debtor of $20,000 to pay off the truck and for operating
expenses. On the same date, Debtor executed a Promissory Note for $20,000 in
favor of Camp. Ex. B. Initially, Camp took no steps to perfect her security
interest. It was not until July 13, 2005, that Camp's name was noted as a
lienholder by the Idaho Transportation Department on the Ford's certificate of
title. Ex. 14.

**B.     Analysis**

In his Second Amended Complaint, Trustee alleges that within one
year of the filing of her bankruptcy petition, Debtor transferred a security interest
in her 2000 Ford F350 truck to Camp with the intent to hinder, delay or defraud
her creditors. Trustee seeks to avoid Camp's security interest in the truck pursuant
to § 548(a)(1).

Section 548 of the Code provides:

MEMORANDUM OF DECISION - 51

> (a)(1) The trustee may avoid any transfer of an interest
> of the debtor in property, or any obligation incurred by
> the debtor, that was made or incurred on or within one
> year before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily--
>> (A) made such transfer or incurred such
>> obligation with actual intent to hinder,
>> delay, or defraud any entity to which the
>> debtor was or became, on or after the
>> date that such transfer was made or such
>> obligation was incurred, indebted. . .

In connection with an avoidance claim, because it is often impracticable to

demonstrate an actual intent to hinder, delay or defraud creditors with direct

evidence, courts frequently infer fraudulent intent from the circumstances

surrounding the target transfer. *Acequia, Inc. v. Clinton* (*In re Acequia*), 34 F.3d

800, 806 (9th Cir. 1994). In considering the surrounding circumstances, courts

take particular note of long-recognized indicia or badges of fraud. *Id.* "The

presence of a single badge of fraud may spur mere suspicion; the confluence of

several can constitute conclusive evidence of actual intent to defraud, absent

'significantly clear' evidence of a legitimate supervening purpose." *Id.* "[O]nce a

trustee establishes indicia of fraud in an action under § 548(a)(1), the burden shifts

to the transferee to prove some 'legitimate supervening purpose' for the transfer at

issue." *Id.*

MEMORANDUM OF DECISION - 52

The transaction whereby Debtor granted the security interest in her truck to Camp is tainted with several indicia of fraud.  These include Debtor's close relationship with Camp, the suspect nature of the documents regarding the exchange, certain incredible or unreliable testimony about the circumstances, and Debtor's questionable behavior with respect to Hall, another creditor.

While not technically an insider as defined by the Code in § 101(31), Camp was more than a casual acquaintance of Debtor.  As previously explained, Camp is a long-time close friend of Debtor, and was a trusted employee of Debtor's business, Bachman Transport.  From her relationship with Debtor, Camp became aware that Debtor was facing serious financial difficulties and that she intended to sell Bachman Transport to Rocky Mountain.

As noted above, Debtor and Camp executed various documents in connection with the transfer of the security interest.[19]  However, contrary to the

---

[19]  The presence of these documents stands in stark contrast when compared to nearly all the transfers and other transactions regarding Debtor's property.  For example, though she was "in business," with respect to her horses, Debtor's normal practice was to deal in cash, without the aid of invoices, contracts or other significant documentation evidencing a sale and other dealings with others.  Debtor's books and records, or what there are of them in evidence, show only the most minimal efforts to maintain evidence of her various dealings.  However, for no apparent reason, and while orchestrated by Debtor, this transaction comes complete with a contract, a promissory note, and a UCC security agreement.  Moreover, given the inconsistencies in the witness testimony at trial and these documents, the only documents pertaining to this transfer the Court is inclined to accept as reliable are those created and issued by the Idaho Transportation Department, namely, the applications for, and certificates of title.

MEMORANDUM OF DECISION - 53

express language in the agreement letter indicating that Camp agreed to willingly

loan $20,000 to Debtor, Camp testified at trial that, at the time the note and

security agreements were signed, she advanced no new money to Debtor.  Trial

Transcript, Vol. II of IV, p. 88, line 4.  Instead, she explained the $20,000 figure in

the note and security agreement actually represented back wages earned by Camp

for the services she had rendered to Bachman Transport and Rocky Mountain for

which she was never paid.  *Id*. at p. 87, line 19.  And, importantly, while the note

and security agreement were signed by Debtor individually, and the truck was

owned by Debtor, Camp conceded that her claim for past wages was not Debtor's

personal obligation, but rather was a debt owed by the two corporations.  *Id*. at p.

90, line 12.  Camp also testified that in February 2005, when the note and

agreements were allegedly signed, Bachman Transport and Rocky Mountain did

not owe her $20,000.  In fact, those corporations only owed her $8,114.  Trial

Transcript, Vol. II of IV, p. 89, line 13.

Despite testifying that she advanced no new money when the note

and other documents were signed, Camp testified that a week later, on March 3,

2005, she gave Debtor a cashier's check for $10,000.  Apart from the testimony of

Debtor and Camp, the record is devoid of any evidence to document this transfer.

The Court has already noted that Debtor's testimony is not credible.  In addition,

MEMORANDUM OF DECISION - 54

Camp's testimony regarding the cashier's check and its source is contradictory, and in the Court's view, is not credible.

Initially, Camp explained that she sold her horse, Edged in Ice, for $10,000 in February 2005, and gave that money to Debtor.  *Id.* at p. 120, line 5.  However, Debtor testified that she knew that horse was sold for much less.  Trial Transcript, Vol. III of IV, p. 188, line 16.  Later, as part of her case-in-chief, Camp took the stand and attempted to clarify her earlier testimony.  She explained that she had sold a number of horses, and that she "didn't sell the other horse until June 205 [sic]."[20]  Trial Transcript, Vol. IV of IV, p. 159, lines 7 through 16.  Trustee then introduced the sale documents from Nampa Livestock Marketing, Inc. regarding Edged in Ice.  These documents show that Camp did not sell Edged in Ice in February 2005 for $10,000, but rather, sold him on June 26, 2005 for $2,000.  Ex. 79.

While both Camp and Debtor contend that the cashier's check was given to Debtor on March 3, 2005 and that its purpose was for Debtor to pay off her loan on the truck, the certificate of title indicates that Ford Motor Credit, Inc., released its lien on March 1, 2005, two days *prior* to Debtor's alleged receipt of Camp's cashier's check.  Ex. 14.  Thus, not only is the proof regarding the source

---

[20]  In light of Trustee's rebuttal witness, Ms. Hughes, the Court infers that the "other horse" Camp referred to here was Edged in Ice.

MEMORANDUM OF DECISION - 55

of the alleged $10,000 transfer suspect, how the funds were then distributed

(assuming they existed to begin with), remains a mystery.

In addition to the untenable explanation regarding the source of

Camp's loan and how Debtor used the funds, it is undisputed that Debtor never

made a single payment to Camp on her alleged loan.  Even so, at no point in time

did Camp attempt to repossess the truck which she contends secures this loan.

Moreover, of course, the Court has considered that nearly five months elapsed

before Camp had her lien recorded on the title.  *See* Ex. 14.

Around the same time, in late February 2005, Debtor also solicited

financial help from Hall, supposedly, to pay off her debt to Ford Motor Credit.

Hall agreed to loan Debtor some money, and gave her a check for $10,000.[21]  At

trial, Debtor was careful to answer questions about this transaction in a narrow,

hyper-technical fashion.  Debtor was asked whether she ever borrowed money

from Hall to help pay off Ford Motor Credit.  Debtor responded, "I did not borrow

money from Dan Hall to pay off the Ford Motor Credit."  Trial Transcript, Vol. III

of IV, p. 185, lines 7-8.  However, when asked if she ever took $10,000 from him

---

[21]  Hall is an unsecured creditor in this case.  He has submitted a proof of claim
for $10,000.  Attached to his claim is the cancelled check, made payable to Debtor and
endorsed by her.  It is dated March 4, 2005, and has the notation, "Loan Ford One Ton"
on the memo line of the check.  And, as noted above, the title certificate indicates the
Ford Motor Credit lien had been released on March 1, or in other words, prior to Debtor's
receipt of Hall's money.

MEMORANDUM OF DECISION - 56

she answered in the affirmative.  *Id.* at p. 185, line 12.  She explained that she

initially asked him for the money to pay off the truck, but that she used the money

for something else.  *Id.* at p. 185, lines 16-24.  Camp knew about the check from

Hall.  When Camp was asked why she didn't inform Hall that Debtor did not use

the money he had loaned her to pay off the truck lien, she responded, "It's not my

business."  Trial Transcript, Vol. II of IV, p. 124, line 20.

Trustee has established sufficient indicia of fraud are present

concerning Camp's security interest to call its legitimacy into question.  He has

shown evidence that the loan was never made, and even if Camp extended some

sort of credit to Debtor, the documents executed by Camp and Debtor are

unreliable.  Certainly, based upon this showing, the burden effectively shifted to

Camp to demonstrate the bona fides of Debtor's transfer of the Ford lien.  *See*

*Acequia*, 34 F.3d at 806.  Camp has failed to do so.  Considering all the

circumstances, evidence and testimony, the Court finds that this transaction was a

sham, and that Debtor transferred a security interest in her Ford truck to Camp

with the actual intent to hinder and defraud her creditors.  As such, Trustee is

entitled to avoid Camp's security interest under § 548(a) and § 550.

**V.     Trustee's Objections to Debtor's Exemptions**

MEMORANDUM OF DECISION - 57

### A.    Additional Facts

Debtor claimed the real property described as 23885 Boehner Road, Wilder, Idaho exempt as her homestead on Schedule C.[22]  She listed the current market value of that property at $110,000, and the value of her exemption at $47,000.  At the § 341(a) creditors meeting, Debtor explained that there were two separate mortgages on that property with a total amount due of $100,000.  She also explained that she had the property listed for sale, with an asking price of $140,000.  Ex. 4, p. 6.  Shortly after the meeting, Trustee went to the property and met with Debtor in the travel trailer.  Trustee testified that on that occasion, Debtor had told him that she lived in the trailer.  Trial Transcript, Vol. I of IV, p. 125 line 22 through p. 126 line 5.  Having no evidence to disbelieve her at the time, Trustee did not object to Debtor's claim of exemption.

In October 2006, well after the expiration of 30-day period of time under Rule 4003(b) to object to Debtor's exemption claim, Trustee discovered, by talking with others, that Debtor may not have been living in the trailer when she

---

[22]  Although this same address was used throughout the proceedings to refer to the entire 63-acre Ranch Property, it is clear that Debtor intended to claim a homestead exemption only on the 17-acre parcel to which she had legal title.  At the § 341(a) creditors  meeting, Trustee probed Debtor for information about this property.  Debtor clarified that both she and her mother owned separate parcels within the overall Ranch Property.  She indicated she owned the 17-acre parcel which consisted of irrigated alfalfa and pasture grass, and upon which a travel trailer was parked.  See Ex. 4, p. 4-7.

MEMORANDUM OF DECISION - 58

filed for bankruptcy relief, but had instead been residing in the master bedroom in the house on the five-acre parcel.  At that point, on December 6, 2006, Trustee filed his Second Amended Complaint, in which he objected to Debtor's homestead exemption claim.

On March 23, 2006, Debtor filed amendments to her Schedules B and C to include her interest in a personal injury claim against Sulzer.  Ex. 5. Although Debtor listed the current market value of that claim as "unknown," she estimated the potential award to be in the range of $40,000 to $50,000.  *Id.*  Debtor claimed 100% of that award as exempt pursuant to Idaho Code § 11-604(1)(c). That same day, Trustee filed an objection to Debtor's claim of exemption on the grounds that the exemption was not claimed with specificity as required by Local Bankruptcy Rule 4003.1.  Ex. 6.  Trustee reasoned that listing the market value as unknown and then claiming 100% of that value leaves reasonable doubt that the settlement could potentially exceed funds reasonably necessary for the support of Debtor.  *Id.*  In his Second Amended Complaint, Trustee reiterated his objection to Debtor's personal injury proceeds exemption, and requested to have the Court adjudicate the objection in this adversary proceeding.

    **B.**    **Analysis**

        **1.**    **Homestead Exemption**

MEMORANDUM OF DECISION - 59

"The debtor shall file a list of property that the debtor claims as exempt under subsection (b) of this section. . . .  Unless a party in interest objects, the property claimed as exempt on such list is exempt."  11 U.S.C. § 522(l).  Rule 4003(b) provides, in pertinent part:

> A party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later. The court may, for cause, extend the time for filing objections if, before the time to object expires, a party in interest files a request for an extension.

If a trustee or other interested party does not object to a claim of exemption within 30 days after the conclusion of the meeting of creditors, or the filing of any amendment to the list or supplemental schedules, and the court has not granted an extension to the time for filing an objection, the right to contest the claim of exemption is forfeited.  *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643-44 (1992).  As the Supreme Court has explained, this is a firm time limit: "Deadlines may lead to unwelcome results, but they prompt parties to act and they produce finality."  *Id.* at 644.  Thus, "[u]nder *Taylor*, even an exemption that is totally baseless will result in the property at issue being exempt if neither the trustee nor another party in interest timely objects to the exemption."  *Morgan v.*

MEMORANDUM OF DECISION - 60

*Federal Deposit Ins. Corp.* (*In re Morgan*), 149 B.R. 147, 151 (9th Cir. BAP 1993).

Trustee's objection to Debtor's homestead is untimely, and therefore the Court declines to consider it. Trustee did not object within 30 days of the conclusion of the § 341(a) meeting, nor did he ask the Court to extend the time period within which to file an objection. Thus, Trustee forfeited any right to challenge Debtor's homestead exemption claim. *Taylor*, 503 U.S. 638, 643-44.

Trustee's argument that Debtor fraudulently sought a homestead exemption by making it appear as though she was living in the travel trailer, while actually residing in the house, and that Debtor would therefore not be entitled to an exemption under Idaho law, is of no help to him. Under *Taylor*, having failed to object within the allotted time, Trustee "cannot contest the exemption at this time whether or not [Debtor] had a colorable statutory basis for claiming it." *Id.* at 644; see also *Morgan*, 149 B.R. at 151.

### 2.    Debtor's Personal Injury Proceeds Exemption

Rule 1009(a) allows a debtor, generally, to amend her bankruptcy schedules as a matter of course at any time prior to the closing of her case. Such amendments are liberally allowed, and no court approval is required. *Martinson v. Michael* (*In re Michael*), 163 F.3d 526, 529 (9th Cir. 1998). This policy reflects

MEMORANDUM OF DECISION - 61

the debtor's obligation to truly and completely disclose all her assets, debts, and relevant facts concerning her financial affairs.

However, case law recognizes that the bankruptcy court may deny a debtor's right to amend an exemption schedule where the debtor is guilty of bad faith, or where the delay in claiming the exemption has prejudiced creditors. *Id.*; *Magallanes v. Williams* (*In re Magallanes*) 96 B.R. 253, 255-56 (9th Cir. BAP 1988). The presence of bad faith must be determined after review of the entirety of the evidence, and generally involves consideration of whether debtors have attempted to conceal assets. *Arnold v. Gill* (*In re Arnold*), 252 B.R. 778, 785-86 (9th Cir. BAP 2000).

Bad faith in the context of amending bankruptcy schedules includes such acts as hiding assets or attempting to do so by any means, including purposefully undervaluing assets, or waiting to amend until after the bankruptcy estate has been successful in litigating a claim in order to shift the risk of funding litigation to the estate. *Arnold*, 252 B.R. at 786; *In re Hoffpauir*, 258 B.R. 447, 452-53 (Bankr. D. Idaho 2001). Mere delay in claiming an exemption is not bad faith. *Arnold*, 252 B.R. at 786.

In this case, Debtor did not amend her schedules to claim a personal injury exemption until March 23, 2006. While a five-month delay in filing that

MEMORANDUM OF DECISION - 62

amendment is insufficient standing alone to demonstrate bad faith, that delay may be considered in tandem with the other relevant circumstances in this case as evidence of bad faith.

At trial, Debtor testified that in September 2005, prior to filing her bankruptcy petition, she did not know that she would receive additional settlement funds from Sulzer on her pending personal injury claim. Trial Transcript, Vol. III of IV, p. 96, lines 9-11. The Court finds Debtors' testimony incredible and inconsistent with the evidence in the record.

Debtor's counsel offered Exhibit G into evidence. It contains a letter to Debtor from the Office of the Claims Administrator, Sulzer Settlement Trust, regarding the determination of settlement benefits for Debtor's claim. The letter is dated July 1, 2005, and plainly indicates that Debtor's claim for compensation was timely submitted, complete, and that Debtor was eligible for extraordinary injury fund benefits.[23] Ex. G, p. 5. Debtor's interpretation of the letter as merely a "preliminary determination" which "means really nothing" is unreasonable. Trial

---

[23] Debtor testified that the personal injury settlement from Sulzer was structured into two separate parts. The first part was designed as compensation for pain and suffering and the second part was for permanent disabilities caused by the faulty surgical parts used in her treatment. Debtor received three separate payments in connection with the first part of the settlement, in 2002, 2003, and 2004. The letter in Ex. G focuses solely on the second portion of the settlement. Claims for disability under that aspect of the settlement were to be paid from a fund known as the "extraordinary injury fund."

MEMORANDUM OF DECISION - 63

Transcript, Vol. III of IV, p. 98.  In a paragraph entitled "Important Information

Regarding Finality of Benefit Determination," set apart in bold, all uppercase text,

the letter explained:

> **. . . IF YOU DISAGREE WITH ANY
> PRELIMINARY OR FINAL DETERMINATION,
> YOU MUST CONTEST OR APPEAL THAT
> DETERMINATION.  IF YOU DO NOT TIMELY
> CONTEST OR APPEAL . . . YOUR CLAIM WILL
> BE DEEMED FINALLY RESOLVED AND MAY
> NOT BE CONTESTED OR APPEALED ANY
> FURTHER.**

Ex. G, p. 6 (emphasis in original).  Debtor did not contest or appeal her benefit

determination, and thus it is fair for the Court to assume that her benefit

determination was deemed final, and that a settlement payment consistent with the

preliminary determination would be forthcoming.

In September 2005, consistent with the letter, Debtor received a

$47,000 payment.  By October, when she filed her bankruptcy petition, she had

spent the entire sum.  Debtor did not initially disclose her interest in the personal

injury claim, nor did she list the preferential payments she had made with most of

the settlement proceeds in her SOFA.  In addition, Debtor did not disclose that she

would receive additional settlement checks in the future.  Importantly, Debtor did

not amend her schedules concerning the personal injury claim until after Trustee

became aware of the settlement.

MEMORANDUM OF DECISION - 64

"'The operation of the bankruptcy system depends on honest reporting.  If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive.'" *Arnold*, 252 B.R. at 785-86 (quoting *In re Yonikus*, 996 F.2d 866, 872 (7th Cir. 1993)).  "Active concealment of an asset no doubt requires denial of the exemption claim."  *Andermahr v. Barrus* (*In re Andermahr*), 30 B.R. 532, 534 (9th Cir. BAP 1983) (citing *In re Doan*, 672 F.2d 831, 833 (11th Cir. 1982)).  As the Court discussed above, Trustee has proven by a preponderance of the evidence that Debtor attempted to conceal her interest in the personal injury claim and settlement proceeds.  The same conduct which results in denial of her discharge constitutes evidence of bad faith sufficient to reject her attempt to amend her Schedule C to claim an exemption in the personal injury proceeds.  Her exemption claim will thus be denied.

## Conclusion

Debtor was able to weave a tangled web of suspicious, and in some cases, fraudulent transactions both before and after her bankruptcy filing.  In some instances, she was aided by others.  Under the Bankruptcy Code, it is clear that Debtor is not the sort of honest, but unfortunate debtor who should benefit from

MEMORANDUM OF DECISION - 65

the fresh start afforded by a discharge of her debts.  In addition, Trustee is

empowered by the Code to avoid many of the transactions engineered to avoid

payment of Debtor's creditors.

In sum, the Court concludes:

1.  Three separate bases exist upon which Debtor should be denied a

discharge:

A.  Pursuant to § 727(a)(2), it has been shown that Debtor

intended to hinder, delay, or defraud Trustee and her creditors by concealing her

ownership interests in several horses, her 2005 Yamaha Kodiak ATV, and a

personal injury claim and the proceeds from its settlement.

B.  Pursuant to § 727(a)(3), it has been shown that Debtor

failed to keep and preserve adequate records of her financial affairs and her

business transactions.

C.  And pursuant to § 727(a)(4)(A), it has been shown that

Debtor knowingly and fraudulently made false oaths and accounts regarding her

horses, her 2005 Yamaha ATV, and her personal injury claim and the proceeds

from its settlement.

2.  Pursuant to § 544(b), Trustee is entitled to avoid all of the liens

which Black recorded on the titles to Debtor's motor vehicles on August 10, 2004.

MEMORANDUM OF DECISION - 66

In addition, Trustee may avoid Debtor's transfer of the 2000 Sundowner horse trailer to Black.

3.  Pursuant to applicable state law, it has been shown that Debtor is the beneficial owner of the 5- and 10-acre parcels of Ranch Property.  Title to those parcels should be quieted in the Trustee on behalf of the bankruptcy estate so that these valuable assets may be sold for the benefit of Debtor's creditors.

4.  Pursuant to § 548(a)(1), Trustee is entitled to avoid Camp's security interest in Debtor's 2000 Ford F350 pickup.

5.  Solely because Trustee failed to oppose her claim in a timely manner, Debtor must be allowed a homestead exemption on the 17-acre parcel.

6.  However, Debtor's attempt to tardily amend her Schedule C to include a claim of exemption in the proceeds from her personal injury settlement is denied.  Debtor is not entitled to an exemption in these proceeds.

The Court hereby requests that any motions to amend the findings of fact, conclusions of law, and rulings of the Court set forth herein be filed within ten days of the entry of this Memorandum.  In the absence of such motions, counsel for Trustee shall prepare an appropriate form of judgment consistent with this Memorandum for submission to and entry by the Court.  Counsel for the

MEMORANDUM OF DECISION - 67

defendants shall, without unreasonable delay, approve the proposed form of

judgment.

Dated:  December 10, 2007

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 68